Hand-Delivered

# UNITED STATES DISTRICT COURT

### for the

_____ District of _____

_____ Division

FILED
CHARLOTTE, NC

JAN 15 2025

US DISTRICT COURT
WESTERN DISTRICT OF NC

Benjamin B. Bowman

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

The Charlotte Mecklenburg Police Department;
The Providence Group, City of Charlotte, Bernie
Smith and Individual Defendants

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:25- cv- 29-FDW
*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* ☑ Yes ☐ No

## COMPLAINT FOR A CIVIL CASE

**I.    The Parties to This Complaint**

    **A.    The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Benjamin B. Bowman |
| Street Address | PO Box 184 |
| City and County | Paw Creek, Mecklenburg |
| State and Zip Code | NC, 28130 |
| Telephone Number | |
| E-mail Address | benclt820@gmail.com |

    **B.    The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Charlotte Mecklenburg Police Department |
| Job or Title *(if known)* | |
| Street Address | 601 E Trade St |
| City and County | Charlotte; Mecklenbury |
| State and Zip Code | North Carolina 28202 |
| Telephone Number | (704) 336-7600 |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | The Providence Group |
| Job or Title *(if known)* | |
| Street Address | 300 W. Summit Ave. Suite 250 |
| City and County | Charlotte; Mecklenbury |
| State and Zip Code | North Carolina 28203 |
| Telephone Number | 704-200-2365 |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | City of Charlotte |
| Job or Title *(if known)* | City Attorney Anthony Fox |
| Street Address | 600 East 4th Street |
| City and County | Charlotte, Mecklenburg |
| State and Zip Code | Charlotte 28202 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | Bernie Smith |
| Job or Title *(if known)* | Property Manager |
| Street Address | |
| City and County | Charlotte, Mecklenburg |
| State and Zip Code | North Carolina 28202 |
| Telephone Number | 704.315.6824 |
| E-mail Address *(if known)* | bsmith@providencegroup.com |

II.     **Basis for Jurisdiction**

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question          ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

A.     **If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.); Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); (42 U.S.C. § 2000a et seq.); 42 U.S.C. § 1983; 28 U.S.C. § 1331

B.     **If the Basis for Jurisdiction Is Diversity of Citizenship**

1.     The Plaintiff(s)

a.     If the plaintiff is an individual

The plaintiff, *(name)* _____, is a citizen of the State of *(name)* _____.

b.     If the plaintiff is a corporation

The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____,

and has its principal place of business in the State of *(name)*

_____.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.     The Defendant(s)

a.     If the defendant is an individual

The defendant, *(name)* _____, is a citizen of the State of *(name)* _____. Or is a citizen of *(foreign nation)* _____.

    b.    If the defendant is a corporation

The defendant, *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

INTRODUCTION: When law enforcement and corporate entities collude to violate fundamental civil rights, they do not merely errthey abdicate their duty. This case exposes the systemic failures of the Charlotte–Mecklenburg Police Department (CMPD), the City of Charlotte, and Providence Group, whose collective negligence, retaliation, and unlawful conduct culminated in blatant violations of the Americans with Disabilities Act (ADA), constitutional rights and basic human decency. Their misconduct was not a fluke. It was deliberate, systemic and entrencheda chilling reminder that institutional neglect remains alive and wellcloaked in modern excuses but rooted in vintage exclusion.

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Compensatory Damages; Punitive Damages; Treble Damages (UDTPA); Injunctive Relief; Legal Fees and Costs

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:            01/15/25

Signature of Plaintiff

Printed Name of Plaintiff      Benjamin B. Bowman

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address            benclt820@gmail.com

Print            Save As...            Add Attachment            Reset

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

**Benjamin B. Bowman, Plaintiff**

**v.**

**Charlotte-Mecklenburg Police Department (CMPD), City of Charlotte, Providence Group, Bernie Smith, and Individual Defendants, Defendants**

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

When law enforcement and corporate entities collude to violate fundamental civil rights, they do not merely err—they abdicate their duty. This case exposes the systemic failures of the Charlotte-Mecklenburg Police Department (CMPD), the City of Charlotte, and Providence Group, whose collective negligence, retaliation, and unlawful conduct culminated in blatant violations of the Americans with Disabilities Act (ADA), constitutional rights and basic human decency.

Their misconduct was not a fluke. It was deliberate, systemic and entrenched—a chilling reminder that institutional neglect remains alive and well—cloaked in modern excuses but rooted in vintage exclusion.

## JURISDICTION AND VENUE

1. **Jurisdiction** arises under 28 U.S.C. §§ 1331 and 1343 and 1367, encompassing federal claims under the ADA and 42 U.S.C. § 1983 and related state claims under North Carolina law.

2. **Venue** is proper under 28 U.S.C. § 1391(b) as all events occurred in this district and Defendants conduct operations within this district.

## PARTIES

**Plaintiff:** Benjamin B. Bowman, a Black male, with disabilities, including intellectual disability and anxiety.

**Defendants:**

**CMPD:** An agency tasked with upholding the law but failing to understand or enforce it.

**City of Charlotte:** Complicit in systemic failures through deliberate indifference to training and oversight.

**Providence Group:** A private entity weaponizing police to enforce retaliatory practices and non-compliance.

**Bernie Smith and Individual Defendants:** Officers and employees whose actions are central to this lawsuit.

**FACTUAL ALLEGATIONS**

**I. January 26, 2022: A Theory of Injustice**

3. Plaintiff entered Optimist Hall with his service animal, Beau, trained and fully compliant with the ADA.

4. Within minutes, Plaintiff was subjected to unlawful demands for documentation and non-compliant treatment by Providence Group staff.

5. CMPD officers, summoned without justification, escalated the situation despite admitting on body camera footage that there was no legal basis for their presence.

6. Shifting Justifications: Providence Group initially cited Beau as the issue but after Plaintiff cited ADA protections, the property manager changed the justification to *"creating a disturbance,"* towards restaurant patrons, despite patrons—and Providence Group's senior leadership stating that their own internal video—confirmed false and pretextual claims of a disturbance.

7. CMPD officers arrived, ignored ADA regulations, and justified eviction based on unfounded claims. One officer likened Plaintiff's removal to asking someone to leave private property, dismissing the facility's status as public accommodation, according to video footage.

8. Officers refused to view ADA legal materials Plaintiff offered from a computer, instead asserting that *"25 years in law enforcement"* justified their actions, evidencing a lack of training and intent to intimidate rather than comply with the law, which CMPD's body worn video footage shows.

9. Video captured all witnesses at the scene informing CMPD that Plaintiff caused no such disturbance—and that Plaintiff was being victimized, confirming the discriminatory nature of Defendants' concerted actions.

10. CMPD advised Plaintiff to purchase civil rights, stating *"We're not here to contest the dog. If he wants, he can get an attorney and do that civil stuff..."*

11. CMPD presented Plaintiff with a false choice: leave the property or face arrest, requiring Plaintiff to part from Beau, in violation of ADA protections and constitutional rights.

## II. January 27, 2022: A Study in Frozen Retaliation

12. The following day, Plaintiff attempted to file a formal complaint at CMPD headquarters but was denied entry under pretextual claims about his service, forced to remain outside in 29-degree weather.

13. CMPD officers compared Beau to a "*weapon*," and ignored well-established ADA protections, displaying willful ignorance and reckless disregard.

14. Officers blatantly refused to review Plaintiff's cell phone containing the ADA's relevant FAQs—a striking display of reckless disregard for Title II of the ADA, which mandates law enforcement to engage in an interactive process. This willful ignorance not only created unnecessary barriers but actively obstructed Plaintiff's rightful access to a public space.

15. A CMPD attorney, in a glaring misstep, fed an officer blatantly false legal information, asserting that a service animal must possess a tag issued by the Department of Health and Human Services to validate its status. The officer,

4

parroting this erroneous counsel, declared, *"I spoke with our police attorney... There is a stipulation that you have a tag indicating the dog is a service animal."*

16.     Officers relied on an unlawful personal policy to justify their actions. One officer stated: *"It's the officer's policy that we have some type of documentation [for service animal]."* This false representation contradicts the ADA. The enforcement of a non-existent legal standard reflects willful non-compliance with federal law, resulting in denial of equal access.

## Systemic Failures: A Pattern, Not an Anomaly

Defendants' conduct reflects institutional failures:

- CMPD's lack of ADA training and procedural compliance.
- Providence Group's retaliatory conduct following an ADA complaint.
- The City of Charlotte's deliberate indifference to its oversight responsibilities.

## RELIEF CLAIMS:

### Count I: ADA Violations

17.     Defendants violated ADA Title II and III by failing to provide reasonable accommodations, demanding unlawful documentation and retaliating against Plaintiff for asserting his rights.

## Count II: 42 U.S.C. § 1983—Equal Protection and Due Process Violations

18.    CMPD and the City of Charlotte, under color of law, deprived Plaintiff of his constitutional rights through pretextual actions, deliberate indifference and failure to intervene.

## Count III: Negligence and IIED

19.    Defendants' conduct was reckless, causing foreseeable harm, including public humiliation and exacerbation of Plaintiff's medical conditions.

## Count IV: Retaliation

20.    Providence Group retaliated against Plaintiff's by summoning law enforcement immediately after an ADA complain, escalating the situation unnecessarily.

## Count V: Monell Doctrine—Systemic Failures (City of Charlotte)

21. The City of Charlotte exhibited deliberate indifference to its constitutional obligations, failing to train CMPD officers adequately on ADA compliance and other compliance policies.

## Count VI: Violations of the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA)

22. Providence Group engaged in deceptive practices by shifting justifications, providing false information to CMPD and leveraging retaliatory practices that were not compliance with federal obligations.

6

**DAMAGES**

Plaintiff seeks relief as follows:

**Compensatory Damages:**

- **Economic $10,000,000:** Lost wages, medical costs, opportunity costs and diminished earning capacity.

- **Non-Economic Losses $5,000,000:** Emotional distress and public humiliation

- **Long-term health impacts: $5,000,000**

**Punitive Damages:**

- To impress upon Defendants—and similarly situated entities— the grave consequences of prioritizing convenience over compliance with the law. These damages serve to deter future misconduct, sending an unambiguous message that systemic failures and calculated non-compliance will not be tolerated in a society committed to equal justice under the law.

    o Providence Group: $6,000,000

    o CMPD: $4,000,000

    o City of Charlotte: $5,000,000

**Treble Damages (UDTPA):**

- Under UDTPA for intentional and deceptive practices by Providence Group.

7

**Injunctive Relief:**

- CMPD: Implement mandatory ADA training and procedural reforms.
- Providence Group: Employ an ADA compliance officer and establish a corrective action framework.

**Legal Fees and Costs:** $500,000

Filing fees, service fees, transcript fees, witness fees, document reproduction costs, electronic evidence costs, expert witness fees, investigative costs, research costs, equitable awards, prejudgment interest and any other fees the court deems appropriate to protect the public's interests.

Respectfully submitted,

Benjamin B. Bowman, MBA, MSJ

Plaintiff

| Time | Event | CMPD's Acts | Optimist Hall's Acts | Rule | Misc. |
|------|-------|-------------|----------------------|------|-------|
| ~10:00-10:05 am | I entered Optimist Hall with my service animal, Beau, and got coffee from *"Undercurrent"* | | Defendant's staff unlawfully states that service animals require vests | ADA | |
| ~10:10-11:00am | I worked on my laptop across from *"Boxcar Betty"* adjacent to other patrons | | | | |
| ~11:00am | I answered Bernie Smith's ADA related questions and politely disengaged. | | Bernie Smith asked me a flurry of questions— some related to ADA some unrelated. | | ~11:30am **Bernie Smith to CMPD:** "Riiight (sarcastically) to remind him to take his medicine? (shakes head in dispute). I'm sorry..." <br><br> **CMPD to Bernie Smith:** *"I believe he is correct. The ADA... they don't have to say why they're a service dog."* |
| ~11:25am | I emailed info@optimisthall.com to report Bernie Smith's non-compliance with ADA requirements, as is my right. | CMPD & Optimist Hall acted in a concerted effort to escalate law enforcement actions based on **false pretenses** and shifting justifications. | At no point in time did Bernie Smith or any other Optimist Hall staff ask me to leave. And Smith doesn't even tell CMPD she asked me to leave. | **Retaliation** -42 U.S.C. § 12203, prohibits retaliation against individuals who: assert their ADA rights; oppose unlawful practices under ADA. <br><br> -42 U.S.C. § 1983, covers retaliation as a violation of equal protection and due process rights **Bad Faith Negligence IIED** | |

| | | | | Bad Faith | |
|---|---|---|---|---|---|
| | Plaintiff attempts to show CMPD FAQs from ADA's website, providing compliance clarity. | Ignores Plaintiff's de-escalation and clarification attempts. | | | |
| | | CMPD Officer calls Bernie Smith "a Karen" and states he's witnessed other patrons bringing their dogs into Optimist Hall without issue. | | | Witnesses tell CMPD officers they frequently see pets at Optimist Hall but never witnessed pet owners having CMPD called on them. |
| 01/26/2022 | Incident at Optimist Hall: Bernie Smith questions Ben about his service animal. | Officer states, "Private businesses can refuse service for any reason, even if discriminatory," ignoring ADA protections. | Providence Group later admits on 02/01/22 call: "You were sitting peacefully." | **ADA Title III (Public Accommodations):** Prohibits discrimination based on disability, requiring equal access. | CMPD relied on unsubstantiated claims of "disturbance" that Providence's own review disproved. |
| 01/26/2022 | Bernie Smith claims Ben was "combative" and "aggressive." | Officer Thao privately admits, "She's definitely a Karen," implying bias and overreaction. | Providence Group admits: "It escalated quicker than it should have." | **ADA Service Animal Guidelines:** Limits questions about service animals to whether it's required for a disability and what task it performs. | Providence Group's video shows no aggression, contradicting the disturbance claim, further solidifying **shifting justifications** as pretext for discriminatory actions. |
| 01/26/2022 | CMPD officers refuse to view ADA FAQs Ben attempted to show them on his laptop. | Officer states, "25 years in law enforcement tells me..." instead of reviewing legal guidance. | No immediate response—Providence Group later admits misunderstanding ADA rules and promises staff retraining. | **Failure to Make Reasonable Accommodations:** ADA mandates consideration of disability-related needs. | CMPD's refusal to view evidence aligns with Providence Group's admission that it lacked ADA training, emphasizing systemic **non-compliance** and negligence. |

10

## Vintage Exclusion in Modern Packaging: When Qualified Immunity & Equal Access Collide (Pt. 1)

**By: Benjamin B. Bowman, Plaintiff**

*When the protectors of justice become its offenders, they shatter not only public faith but the foundation of their own legitimacy.*

### Coffee, Contradictions and a Chilling Effect

Imagine this—you're sitting quietly at a table in a bustling food hall, sipping coffee, and working on your laptop. Your service dog rests calmly at your feet, doing what he was trained to do.

And then it happens. The three armed police officers show up.

This story starts at Optimist Hall in Charlotte, North Carolina.

What unfolded there wasn't just an oversight or a misunderstanding. It was a case study in vintage exclusion in modern packaging.

### Purchasing My Rights

Within minutes, officers from the Charlotte-Mecklenburg Police Department (CMPD) arrived, responding to a call that I was disturbing the patrons adjacent to me.

But even the officers weren't clear about what the problem was. **Officer #1** was caught on his body camera asking:

*"Where's he even at? The guy sitting by himself?"*

Because that's what I was doing—sitting quietly.

Before asking me questions or investigating, **Officer #2** quickly made his intentions clear to **Officers #1 and #3:**

*"We're not here to contest the dog. If he wants, he can get an attorney and do civil stuff. But this is private property. We're not here to debate the reasons. They're asking him to leave."*

As if I needed to purchase my rights through an attorney.

**Excuses Over Evidence– Shifting Justifications**

The excuses started early– and burned hotter than a Rolex watch in Time Square.

Beau, my service animal, and I had experienced non-compliance previously– and he's always been there with me as we both typically walk away with our tails tucked in humiliated silence.

This time was different. I decided to take a stand for all of us. As a gang of officers approached me, I politely let them know I was recording.

**Officer #3:** *"I get it, it's a service dog... but she [the property manager] says you have to go, sir."*

When I pressed further, the reason suddenly changed.

**Officer #2:** *"Sir, they're not asking you to leave because of your dog. Now they're saying it's a disturbance."*

But here's the kicker– Optimist Hall's own surveillance footage later contradicted that story. It showed no disturbance.

Even the officers couldn't stick to one explanation.

**Officer #2:** *"So, what happened was, that's the call we got, but now she's saying that you caused a disturbance."*

I challenged that.

**Me:** *"They said I caused a disturbance? No, no, no, no. This officer [Officer #3] just said that it was because of my service animal. Your service animal can't be a disturbance."*

Their reasoning shifted again but **Officer #3** doubled down.

**Officer #3:** *"You were talking belligerently with her and other folks around. So, she doesn't want you here."*

So, what did those other folks around say?

**Witness #1:** *"I didn't see any disturbance from him."*
**Witness #2:** *"I didn't see any disturbance at all."*
**Witness #3:** *"I didn't even know he had a dog until you all came; they both sat quietly."*
**Witness #4:** *"She [the property manager] was the disturbance, not him."*

I firmly but politely asserted that **Officer #3** acknowledge my rights. But that apparently enraged **Officer #1** as he jumped towards me to assert *his* authority.

**Officer #1:** *"Sir, we're not here to debate! They're asking you to leave so you're going to have to leave!!"*

**Me:** [interrupts] *"It's not a debate. You can't kick out somebody out. No, no, no no. According to the ADA, and I can look it up for you just so you can see…"*

**Officer #1:** [interrupts] *"According to 25 years of law experience, when we ask someone to leave because the owner of the property asks them to leave, they have to go!"*

**Constitutional Duty To Protect Rights**

Under the law, officers are required to stop constitutional violations and may be held personally liable if they fail to do so.

However, there's an unwritten law that trumps the duty to intervene. It's called *"The Blue Code of Silence."* And that code that prevents officers from reporting or contradicting fellow officers' actions– even if those actions are unlawful. I know this because my father retired as a police officer and I grew up around police officers, so I've heard the stories.

**The Blue Code of Silence: A Failure to Intervene**

Behind the scenes, CMPD deliberated among themselves—admitting they had no legal grounds to act.

**Officer #2** speaking to **Officer #1:** *"If it's a service animal, we can't do anything."*

Minutes later:

**Officer #2** speaking to **Officer #1:** *"Witnesses didn't see anything. What are we going to do? They're saying the dog hasn't bothered anyone; they say he wasn't doing anything."*

And yet, **Officer #1** made the call: *"We have to get him out because the property manager doesn't want him here."*

Even Optimist Hall's property manager, stumbled through weak justifications, telling officers:

**Optimist Hall:** *"We bring in dogs. Every single time they have tags that it's a service animal."*

But the ADA doesn't require tags and businesses can't require tags—and they knew it.

When pressed further, Optimist Hall deflected, offering a vague accusation about a past incident where someone else's dog was off-leash—and said:

**Optimist Hall:** *"I don't know if it was him, but it would've been a coincidence if it were not him. But trust me, I am the least racist person." (laughs)*

**Vintage Exclusion, Modern Packaging**

**Officer #2 to Officer #1:** *"We need to call a sergeant."*

In the end, *The Blue Code of Silence* prevailed as officers failed to call a sergeant, despite a statement from **Officer #2.**

As I walked out of Optimist Hall, escorted by officers whose body cameras contradicted their claims, I couldn't help but feel the weight of history.

The signs may be gone but the exclusion remains—dressed up in modern language and corporate public relations campaigns. Vintage exclusion in modern packaging.

**What Happens When Penalties Don't Bite?**

The ADA promised fairness but fairness doesn't enforce itself. And when violations cost less than compliance, big businesses and big organizations treat the law like a suggestion.

If fines for ADA violations matched those for other unlawful actions, maybe officers would've thought twice before acting on false claims rather than on facts.

Equal protection under the law should not be negotiable.

If "Whites Only" and "For Colored" signs were wrong in 1935, then disability exclusion can't be right in 2025.

Civil Rights don't defend themselves. We do.

And this time, David is ready.

With 1 in 4 Americans belonging to the disability community, this isn't just about rights and access—it's about whether we still believe in the promise of equality and the guarantee of dignity for all Americans.

President Lyndon B. Johnson once stood before Congress and declared that the fight for civil rights was not a Southern issue or a Northern issue—it was an American issue.

14

And today, this case asks whether that same America still exists—an America where doors open for:

- Veterans returning home with PTSD
- For seniors facing mobility challenges
- For parents raising children with autism
- For workers injured on the job
- For anyone who might one day rely on a cane, a wheelchair or a service animal

Because the truth is, disability doesn't discriminate. It doesn't care about your:

- Politics
- Income
- Education
- Background

Disability touches families in every state, on every street and in every home.

This fight isn't just about the rights of today—it's about protecting the dignity of tomorrow. Anyone can, in a moment, find themselves one accident, one diagnosis or one aging milestone away from needing these protections.

It's about whether we're still a country where laws protect everyone, where justice serves everyone and where access includes everyone—not just those with the loudest voices or those with the deepest pockets.

Because civil rights don't defend themselves. We do.

And this time, David isn't just ready—he's not backing down.

There will be no white flag upon this door—only the memory of Beau, who stood by my side until the very end.

This fight is for him—and for every person and service animal who depends on the promises of equality and access that should never be denied.

Not now. Not ever.



Beau: 10/30/12- 08/11/24

**Part 2:** The next day: Beau at CMPD headquarters; lifting the veil of qualified immunity.